**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

SEP 27 2002

KENNETH S. GARDNER, CLERK
PS REP. - AR

EOD SEP 30 2002

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **EMERALD CASINO, INC.,** | ) Case No. 02-B-22977 |
| | ) |
| Debtor. | ) Hearing Date and Time: |
| | ) October 1, 2002, 10:00 a.m. |

**DEBTOR'S MOTION FOR (I) ORDER SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULE 4001(c) AND (II) FINAL ORDER
AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION
FINANCING PURSUANT TO 11 U.S.C. §§ 105 AND 364(b)**

Emerald Casino, Inc., debtor and debtor in possession ("Debtor"), hereby files

this motion (the "Motion") seeking as follows:

(a)    A final hearing (the "Final Hearing") for this Court to consider entry of an

order authorizing DIP Financing, as set forth in this Motion and the DIP Credit Documents (as

those terms are defined below) filed with this Court; and

(b)    Authorization, pursuant to Sections 105 and 364(b) of the United States

Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Code"), and Rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to obtain post-

petition financing (the "DIP Financing") pursuant to that certain credit agreement, a copy of

which is attached hereto as Exhibit 1 (the "DIP Credit Agreement") between the Debtor and

Donald Flynn as lender ("Lender"), pursuant to which the Debtor would be provided by the

Lender with an unsecured line of credit of approximately $2,325,000 (the "DIP Facility") having

priority under section 503(b)(1) as an administrative expense.

### Jurisdiction

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The bases for the relief requested herein are Sections 105 and 364(b) of the Code and Bankruptcy Rules 2002, 4001 and 9014.

### Background

3.     Emerald is the owner of one of the ten Illinois riverboat gaming owner's licenses authorized by the Illinois Riverboat Gambling Act, 230 ILCS 10/1, *et seq.*, and issued by the Illinois Gaming Board.

4.     In mid-1997 Emerald ceased its riverboat gaming operation that, until that time, was located on the Mississippi River near East Dubuque, Illinois.  Since mid-1997 Emerald's primary activities have been toward the relocation of its gaming operation.

5.     On June 13, 2002 (the "Petition Date"), an involuntary petition under chapter 7 of the Bankruptcy Code was filed against Emerald in this Court.  On September 6, 2002, this Court entered an order for relief with respect to the petition.  On September 10, 2002, Emerald converted this case under chapter 11 of the Bankruptcy Code, and it continues to operate as debtor in possession in this case.

### Relief Requested

### Need for Financing

6.     As a consequence of the circumstances set forth above, the Debtor has insufficient cash to meet ongoing obligations necessary to operate its businesses and pay accruing expenses of administration, including professional fees.  Specifically, without additional financing, the Debtor cannot support its ongoing operations, continue to pay the wages, salaries, rent, utilities

and other expenses necessary to continue the day-to-day operation of its businesses, pay the fees and expenses of Kirkland & Ellis (including its proposed retainer for Kirkland & Ellis) and any other counsel or other professionals or consultants it may retain in the case, and to pay for any expenses that may be incurred by any creditors' committee that might be appointed in this case. In addition, without additional financing, there is the additional risk that, if the Debtor tries to liquidate its assets and business in an orderly fashion, any such sales process will be perceived by potential buyers as a "fire sale" in the absence of additional financing for the foregoing purposes, which can be expected to impact negatively the prices that might otherwise be obtained for the assets and business of the Debtor.

7.      The Debtor should be immediately permitted to obtain access to sufficient post-petition financing, without which the Debtor will have difficulty continuing to operate or generate income or to pay its ongoing and accruing obligations.

8.      Based on the foregoing, it is evident that the consequences of leaving the Debtor without access to the DIP Facility would have a materially adverse effect on the Debtor's estate, its creditors, and other parties in interest. Without the immediate infusion of much needed cash and credit support, the Debtor's business operations will be disrupted; the Debtor will be forced to forego opportunities, which would hinder the Debtor's ability to maintain its value as a going concern; and the Debtor will be unable to pay the professionals it has hired or proposes to hire.

### The DIP Facility

9.      The DIP Financing has been negotiated in good faith and at arm's length between the Debtor and the Lender, and upon the entry of an Order approving the Motion any credit extended and loans made to, or for the benefit of, the Debtor by the Lender pursuant to the DIP Credit Agreement, shall be deemed to have been extended by the Lender in "good faith," as such term is used in Section 364(e) of the Code.

10.    In large part because the most substantial assets of the Debtor (including a license for riverboat gaming operations) is highly illiquid, the Debtor concluded that the Lender is the only financing alternative reasonably available.

11.    The Lender offered debtor in possession financing to the Debtor that would provide the Debtor with the ability to address its immediate financing needs. The Debtor expects that the DIP Facility will enable the Debtor to pay its professionals and consultants and otherwise sustain operations in order to reorganize rapidly and thereafter obtain confirmation of a plan of reorganization. The Debtor's ability to accomplish these goals is dependent upon its ability to obtain post-petition credit for these purposes. The DIP Facility, given the adequacy of the financing and the expedited basis on which such financing is needed, is, as a practical matter, the only alternative available.

12.    This Court previously approved borrowings under the DIP Credit Agreement for the payment of certain pre-petition obligations to certain of the Debtor's professionals. Approximately $2,675,000 was advanced pursuant to those borrowings. Accordingly, approximately $2,325,000 remains available. The proposed DIP Facility will consist of a $2,325,000 unsecured line of credit, and the DIP Credit Agreement attached hereto as Exhibit 1 is the same DIP Credit Agreement previously approved by this Court. The key terms of the DIP Facility are relatively straightforward: Advances under the DIP Facility will have priority as an expense of administration under section 503(b) of the Code. Advances shall be at the discretion of the Lender. Notwithstanding the terms of the DIP Credit Agreement, the Lender has agreed that the commencement of this case shall not constitute an event of default under the DIP Credit Agreement.

4

13.     The Debtor believes that the terms and conditions of the DIP Facility as described in the attached DIP Credit Agreement are fair, reasonable and in the best interests of the Debtor's estate.

### Request for Approval of the DIP Facility

14.     The success of the Debtor's chapter 11 efforts depends to a high degree on the continued viability of its operations.  In particular, the Debtor's ability to maintain favorable relationships with its vendors, pay its professionals and consultants, and satisfy other working capital needs is integral to the Debtor's ability to reorganize successfully.

15.     As of the Petition Date, however, the Debtor had little or no available cash.

16.     Under the DIP Facility, the Debtor is immediately authorized and empowered to borrow up to an aggregate of approximately $2,325,000 (subject to the terms of the DIP Credit Agreement).  The DIP Financing is to be used for the purpose of providing working capital, other general corporate purposes (including the payment of the Debtor's professionals and consultants, subject to the approval of their retention and approval of compensation procedures for them), and payment of any related transaction costs, fees and expenses, all in accordance with the DIP Credit Agreement.  Nothing in the DIP Credit Agreement limits the Debtor's rights to use the proceeds of the DIP Facility, directly or indirectly, to initiate or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against the Lender.

17.     Upon entry of the Order approving the Motion, the Debtor will be expressly authorized and empowered to execute and deliver, among other documents, such documents required to be executed and/or delivered pursuant to the terms of the DIP Credit Agreement to which the Debtor is a party (together with the DIP Credit Agreement, the "DIP Credit Documents")

18.     Upon execution and delivery of the DIP Credit Documents, the DIP Credit Documents will constitute valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their respective terms.

19.     Upon entry of the Order approving the Motion, for all of the Debtor's obligations and indebtedness arising under the DIP Financing and the DIP Credit Documents, the Lender will have, pursuant to Section 364(b) of the Code, an allowed administrative expense claim under section 503(b) of the Code.

20.     Upon approval of this Motion, the Debtor will be authorized and empowered to use proceeds of the Interim Financing in accordance with the terms of the DIP Credit Agreement.

21.     Upon approval of this Motion, the Debtor will be authorized and directed to do and perform all acts to make, execute and deliver all instruments and documents that may be reasonably required or necessary for the Debtor's performance under the DIP Financing, including, without limitation, the execution of the DIP Credit Documents.

22.     The Debtor and the Lender may amend, modify, supplement or waive any provision of the DIP Credit Documents pursuant to the terms thereof if such amendment, modification, supplement or waiver is permitted under the terms of the DIP Credit Documents and is not material (in the good faith judgment of the Debtor and the Lender) without the need to apply to, or receive further approval from, the Court.

23.     Upon entry of the Order approving the Motion and subject only to the provisions of the DIP Credit Agreement, the automatic stay provisions of Section 362 of the Code will be vacated and modified to the extent necessary so as to permit the Lender to exercise, upon the occurrence of an Event of Default and the giving of five business days' written notice to counsel to the Debtor, the United States Trustee, and counsel to any Committee, all rights and remedies provided for in the DIP Credit Documents.

24.     Upon entry of the Order approving the Motion, the DIP Credit Documents and the provisions of this Order will be binding upon the Lender and the Debtor and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor) and inure to the benefit of the Lender and the Debtor and their respective successors and assigns (except with respect to any trustee hereinafter appointed or elected for the estate of the Debtor).

25.     Unless all obligations and indebtedness owing to the Lender under the DIP Credit Agreement shall theretofore have been paid in full, the Debtor shall not seek, and it shall constitute an Event of Default if the Debtor seeks, or if there is entered, an order dismissing this bankruptcy case. If an order dismissing this case under Section 1112 of the Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349(b) of the Code) that (x) the priority claims granted pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all obligations in respect thereof shall have been paid and satisfied in full (and that such priority claims shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims referred to in clause (x) above.

26.     Absent the ability to obtain financing, the Debtor could be forced to shut down entirely and could not retain any professionals to advise it in this case. In that scenario, no creditor will benefit. See, e.g., In re Aqua Assoc., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized."), citing Grant Broadcasting, 71 B.R. 376, 386-89 (Bankr. E.D. Pa.), aff'd, 75 B.R. 819 (E.D. Pa. 1987) and In re Alyucan Interstate Corp., 12 B.R. 803, 809-12 (Bankr. D. Utah 1981).

7

### Approval Under Section 364

27.     Section 364 of the Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on the debtor's property, or a combination of the foregoing.

28.     The Debtor proposes to obtain unsecured financing under the DIP Facility that will have administrative expense priority. Section 364(b) of the Code provides:

> The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(2) of this title as an administrative expense.

11 U.S.C. § 364(b).

### Lack of Available Financing on More Favorable Terms

29.     Unlike other provisions of section 364 of the Code, section 364(b) does not require that the debtor in possession establish that alternate financing is unavailable. See, e.g., In re 495 Central Park Avenue Corp., 136 B.R. 626 (Bankr. S.D.N.Y. 1992). Nor does it require that the Debtor demonstrate the lack of available credit on less restrictive terms or that the proposed loan is reasonable under the circumstances and is beneficial to the estates. Nonetheless, both circumstances exist here. The Debtor's most significant assets are highly illiquid, and therefore it is not reasonable to expect that other sources of financing are readily available. Moreover, any financing would have to occur as an expense of administration, because it is being incurred after the conversion of this case to a case under chapter 11 of the Code.

30.    Under these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) (authorizing secured debtor in possession financing). See also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (a debtor need only demonstrate "by a good faith effort that credit was not available" without the protection of Section 364). Given the Debtor's financial constraints, there is no other realistic source of available financing on terms more favorable than those offered by the Lender.

## Application of the Business Judgment Standard

31.    Because of the Debtor's cash needs, the lack of success in pursuing alternative sources of financing and the impracticability of pursuing (and paying for) numerous other prospective lenders, the Debtor has concluded that, in its business judgment, only the Lender, who already is intimately familiar with the Debtor's business operations, and who has been negotiating with the Debtor prior to the Petition Date, is able to offer a post-petition credit facility to meet the Debtor's working capital needs on the terms, and within the time frame, that the Debtor is seeking.

32.    After appropriate investigation and analysis, the Debtor's management has concluded that the DIP Facility was the only realistic alternative available in the circumstances of this case. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Code's provision for private control of administration of the estate, and

9

threaten the court's ability to control a case impartially." <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985).

33.     In general, a bankruptcy court should defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. <u>In re Curlew Valley Assoc.</u>, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the [Bankruptcy] Code." <u>Id.</u> at 513-14 (footnotes omitted).

34.     The Debtor has exercised sound business judgment in determining that the DIP Facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP Facility. The terms of the DIP Facility are fair and reasonable and are in the best interests of the Debtor's estates. Accordingly, the Debtor should be granted authority to borrow funds from the DIP Lender on the administrative priority basis described above, pursuant to Sections 364(b) of the Code, and take the other actions contemplated by the terms of the DIP Credit Agreement as requested herein.

35.     Given the immediacy of the Debtor's financing needs, the Debtor secured the only feasible new financing facility considering the proposed terms therefor. The Debtor's management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility that is presently before the Court.

### Request For Modification Of Automatic Stay

36.     The proposed DIP Credit Agreement contemplates a modification of the automatic stay established pursuant to Section 362 of the Code to permit the Lender, should it wish to do so, and in its sole discretion, to give the Debtor any notice provided for in the applicable Credit Documents and, subject to specific notice requirements, other remedies under

the DIP Credit Agreement in the event of an Event of Default. Stay modification provisions of this sort are ordinary and usual features of post-petition debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. The Court accordingly should modify the automatic stay to the extent contemplated by the DIP Credit Agreement.

### Notice

37.    Notice of this Motion has been given to (i) the United States Trustee; (ii) the Lender, and (iii) counsel for parties that have entered an appearance in this case. In light of the nature of the relief requested, the Debtor submits that no further notice is required.

### No Prior Request

38.    No previous motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court grant the relief requested in this Motion and that such relief be granted immediately to the extent of the applicability of Bankruptcy Rule 4001(c)(2) and grant such other and further relief as the Court may deem appropriate.

Chicago, Illinois
Dated: September 27, 2002                    Respectfully submitted,

 

KIRKLAND & ELLIS
James H.M. Sprayregen, P.C. (Bar No. 6190206)
Joseph U. Schorer (Bar No. 3128758)
Jonathan P. Friedland (Bar No. 6257902)
200 East Randolph Drive
Chicago, Illinois 60601
Tel:  (312) 861-2000
Fax:  (312) 861-2200

Proposed Counsel for the Debtor and Debtor In Possession

## EXHIBIT 1

**Debtor in Possession Credit Agreement**

# CREDIT AGREEMENT

This Credit Agreement (this "Agreement") is made and entered into as of this 20th day of _August_, 2002, by and between Emerald Casino, Inc., an Illinois corporation (the "Borrower"), and Donald F. Flynn, (the "Lender").

The purpose of the Agreement is to make available to the Borrower an amount not to exceed the sum of $5,000,000 to allow the Borrower to pay its general and administrative expenses, costs related to Borrower's pending notice of denial and disciplinary complaint from the Illinois Gaming Board and any other litigation involving Borrower. Such outstanding legal fees past due shall receive first priority for payment.

In consideration of the undertakings and agreements of the respective parties set forth herein, the parties agree as follows:

1. Line of Credit. In the event the Borrower desires to borrow any amount under this Agreement, the Borrower shall provide written notice of such request to the Lender, which notice shall include the desired amount to be borrowed. The Lender shall decide whether to make the requested Advance. Notwithstanding anything herein to the contrary, the Lender shall not have any obligation to make an Advance under this Agreement, and any decision to make or not to make an Advance is at the absolute and total discretion of the Lender. The aggregate principal amount of all advances made under this Agreement ("Advances") shall not at any time exceed Five Million Dollars ($5,000,000) (the "Aggregate Principal Amount").

2. Advances. Each Advance shall be made on or before the second business day after the Borrower sends Lender a request to borrow funds under this Agreement. Any such request will be sent to Lender's facsimile number on the signature page hereof.

3. Interest rate. Accrued interest on the unpaid principal amount of each Advance from the date of such Advance until such principal is paid in full shall be at a rate per annum (the "Rate") equal to five point seven five percent (5.75%).

4. Payment of Principal and Interest. Accrued interest on each outstanding Advance shall be paid on each anniversary of such Advance. The outstanding principal balance of all Advances and accrued interest shall be due and payable (the "Due Date") in full on the earliest of (i) the third anniversary of the date of this Agreement; or (ii) the date on which any "person" or "group" (as such terms are used for purposes of sections 13(d) and 14(d) of the Securities Exchange Act of 1934) (other than any person (or the affiliates of such person) who is currently a shareholder of the Borrower) is or becomes the "beneficial owner", directly or indirectly, of more than fifty percent (50%) of the capital stock of the Borrower then outstanding. The Borrower may prepay any or all outstanding Advances (and related accrued interest) at any time without penalty.

5. <u>Subordination</u>. The obligations of the Borrower under this Agreement shall be subordinate in right of payment to the prior payment in full of all liabilities of the Borrower under that certain Loan Agreement dated August 26, 1996 between the Borrower and Donald F. Flynn.

6. <u>Events of Default by Borrower: Remedies</u>. (a) The occurrence of any one of the following events shall constitute a default (an "Event of Default") by the Borrower under this Agreement:

    (i)    If the Borrower fails to pay any amount hereunder when due and payable or validly declared due and payable and such default continues for 10 days after notice and demand for such payment has been made by a Lender.

    (b)    Upon an Event of Default, the Lenders shall have the right to declare immediately due and payable the outstanding principal balance of the Advances, including any accrued but unpaid interest, which shall thereupon be immediately due and payable. The Lenders shall give written notice of any such declaration as soon as practicable to the Borrower.

7. <u>Miscellaneous</u>. (a) If the outstanding principal balance, including all accrued but unpaid interest, of all Advances is not paid at maturity, whether by acceleration or otherwise, the Borrower shall pay all costs and expenses of collection and enforcement, including court costs and reasonable attorneys' fees, unless prohibited by law.

    (b)    The Borrower waives presentment, demand and presentation for payment, notice of non-payment and dishonor, protest and notice and expressly agrees that this Agreement or any payment hereunder may be extended from time to time without in any way affecting the liability of the Borrower.

    (c)    The obligation of the Borrower to pay in full any amounts due or to become due hereunder is absolute and unconditional and shall not be affected by any dispute, claim, counterclaim, defense or other right which the Borrower may have to assert against a Lender.

8. <u>Entire Agreement: Amendment: Assignment</u>. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. This Agreement may not be modified, altered or amended except by an agreement in writing signed by each party affected by such amendment. Each Lender may not assign this Agreement, and it shall be binding upon and inure to the benefit of such Lender's successors, assignees, heirs and legal representatives. The Borrower may not assign or transfer this Agreement.

9. <u>Severability</u>. If any provision of this Agreement or the application thereof to any person or circumstances is held invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and provisions of this Agreement shall be several in any such instance.

10. <u>Governing Law</u>. This Agreement shall be governed and interpreted in accordance with the laws of the State of Illinois applicable to contracts made and to be performed therein, without regard to the conflicts of the laws principles thereof.

2

11. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12. Waiver. The waiver by any party of a breach of any provision of this Agreement by any other party shall not operate or be construed as a waiver of any subsequent breach.

13. Notice. All notices and other communications hereunder shall be in writing and shall be deemed given when received, whether personally, by telegram, telex, facsimile transmission (followed by regular mail) or registered or certified mail (return receipt requested) to the parties at the following address (or at such other address for a party as shall be specified by like notice): (a) if to the Borrower, addressed to: Emerald Casino, Inc., 120 North LaSalle Street, Suite 3300, Chicago, Illinois 60602, Attention: Kevin Larson, President and (b) if to a Lender, addressed to the address set forth under the name of such Lender on the signature page hereto.

3

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year specified at the beginning hereof.

EMERALD CASINO, INC.

By: _K Far_____, President +
Name: Kevin D. Larson
Title:   President


LENDER:
DONALD F. FLYNN
676 North Michigan Avenue
Suite 4000
Chicago, Illinois  60611
Facsimile Number:  312/280-3730


Principal Amount:  $5,000,000


Signature of Lender

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EMERALD CASINO, INC., | ) Case No. 02-B-22977 |
| | ) |
| Debtor. | ) Hearing Date and Time: |
| | ) October 1, 2002, 10:00 a.m. |

## ORDER SCHEDULING A FINAL HEARING
## PURSUANT TO BANKRUPTCY RULE 4001(c)

Upon the motion (the "Motion"),[1] dated September 27, 2002, of Emerald Casino, Inc., as debtor and debtor in possession, (the "DIP Borrower" or "Debtor") in the above captioned bankruptcy case (the "Case") seeking:

(a)     A final hearing (the "Final Hearing") for this Court to consider entry of an order authorizing DIP Financing, as set forth in this Motion and the DIP Credit Documents (as those terms are defined below) filed with this Court; and

(b)     Authorization, pursuant to Sections 105 and 364(b) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to obtain post-petition financing (the "DIP Financing") pursuant to that certain credit agreement, a copy of which is attached hereto as Exhibit 1 (the "DIP Credit Agreement") between the Debtor and Donald Flynn as lender ("Lender"), pursuant to which the Debtor would be provided by the Lender with an unsecured line of credit of

---

[1]     Capitalized terms used in this Order, unless otherwise defined, shall have the meaning set forth in the DIP Credit Agreement, as defined herein.

approximately $2,325,000 (the "DIP Facility") having priority under section 503(b)(1) as an administrative expense.

BASED ON THE RECORD BEFORE THIS COURT, IT IS ORDERED that:

1.      A Final Hearing on the Motion shall be held on _____, 2002 at _____.

2.      Any objection to the Motion must be filed and served, so it is actually received by Debtor's proposed counsel, no later than _____ on _____.

3.      Debtor shall serve a copy of this Order by no later than _____, on (i) the United States Trustee; (ii) the Lender, and (iii) counsel for parties that have entered an appearance in this case.

Date: October ____, 2002

_____

Honorable Eugene R. Wedoff
United States Bankruptcy Judge

2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **EMERALD CASINO, INC.,** | ) | **Case No. 02-B-22977** |
| | ) | |
| Debtor. | ) | **Hearing Date and Time:** |
| | ) | **October 1, 2002, 10:00 a.m.** |

## FINAL ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105 AND 364(b) AND SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

Upon the motion (the "Motion"),[1] dated September 27, 2002, of Emerald Casino, Inc., as debtor and debtor in possession, (the "DIP Borrower" or "Debtor") in the above captioned bankruptcy case (the "Case") seeking:

      (a)    A final hearing (the "Final Hearing") for this Court to consider entry of an order authorizing DIP Financing, as set forth in this Motion and the DIP Credit Documents (as those terms are defined below) filed with this Court; and

      (b)    Authorization, pursuant to Sections 105 and 364(b) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to obtain post-petition financing (the "DIP Financing") pursuant to that certain credit agreement, a copy of which is attached hereto as Exhibit 1 (the "DIP Credit Agreement") between the Debtor and Donald Flynn as lender ("Lender"), pursuant to

---

[1]    Capitalized terms used in this Order, unless otherwise defined, shall have the meaning set forth in the DIP Credit Agreement, as defined herein.

which the Debtor would be provided by the Lender with an unsecured line of credit of approximately $2,325,000 (the "DIP Facility") having priority under section 503(b)(1) as an administrative expense.

BASED ON THE RECORD BEFORE THIS COURT, IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.     On June 13, 2002 (the "Petition Date"), an involuntary petition under chapter 7 of the Code was filed against the Debtor in this Court. On September 6, 2002, this Court entered an order for relief with respect to the petition. On September 10, 2002, the Debtor converted this Case under chapter 11 of the Code. The Debtor is operating its business as debtor in possession pursuant to Sections 1107(a) and 1108 of the Code. This Court has core jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C §§ 157(b) and 1334. The statutory predicates for the relief sought herein are Sections 105 and 364(b) of the Code and Bankruptcy Rules 2002, 4001 and 9014;

2.     The DIP Borrowers have an immediate need to obtain (and to continue to have access to) financing so to support its ongoing operations, continue to pay the wages, salaries, rent, utilities and other expenses necessary to continue the day-to-day operation of its businesses, pay the fees and expenses of Kirkland & Ellis (including its proposed retainer for Kirkland & Ellis) and any other counsel or other professionals or consultants it may retain in the case, and to pay for any expenses that may be incurred by any creditors' committee that might be appointed in this case;

3.     The DIP Borrowers are unable to obtain other reasonable alternative financing;

2

4.      The ability of the Debtors to obtain sufficient  working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the Debtors;

5.      The preservation and maintenance of the going concern values of the Debtors is integral to a successful reorganization of the Debtors pursuant to the provisions of Chapter 11 of the Code;

6.      The terms of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration;

7.      The DIP Financing has been negotiated in good faith and at arm's-length between the DIP Borrowers and the Lender and any credit extended for the account of and loans made to, or for the benefit of, the DIP Borrowers by the Lender pursuant to the DIP Credit Agreement, shall be deemed to have been extended by the Lender in "good faith," as such term is used in Section 364(e) of the Code;

8.      The Debtor is immediately authorized and empowered to borrow up to an aggregate of approximately $2,325,000 (subject to the terms of the DIP Credit Agreement; provided, however, that the commencement of this Chapter 11 Case shall not constitute an event of default thereunder, notwithstanding any provision contained therein). The DIP Financing is to be used for the purpose of providing working capital, other general corporate purposes (including the payment of the Debtor's professionals and consultants, subject to the approval of their retention and approval of compensation procedures for them), and payment of any related transaction costs, fees and expenses, all in accordance with the DIP Credit Agreement. Nothing

3

in the DIP Credit Agreement limits the Debtor's rights to use the proceeds of the DIP Facility, directly or indirectly, to initiate or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against the Lender;

9.    The Debtor is authorized and empowered to execute and deliver, among other documents, such documents required to be executed and/or delivered pursuant to the terms of the DIP Credit Agreement to which the Debtor is a party (together with the DIP Credit Agreement, the "DIP Credit Documents");

10.    Upon execution and delivery of the DIP Credit Documents, the DIP Credit Documents will constitute valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their respective terms;

11.    For all of the Debtor's obligations and indebtedness arising under the DIP Financing and the DIP Credit Documents, the Lender will have, pursuant to Section 364(b) of the Code, an allowed administrative expense claim under section 503(b) of the Code;

12.    The Debtor is authorized and empowered to use proceeds of the Interim Financing in accordance with the terms of the DIP Credit Agreement, as modified herein;

13.    The Debtor is authorized and directed to do and perform all acts to make, execute and deliver all instruments and documents that may be reasonably required or necessary for the Debtor's performance under the DIP Financing, including, without limitation, the execution of the DIP Credit Documents;

14.    The Debtor and the Lender may amend, modify, supplement or waive any provision of the DIP Credit Documents pursuant to the terms thereof if such amendment,

modification, supplement or waiver is permitted under the terms of the DIP Credit Documents and is not material (in the good faith judgment of the Debtor and the Lender) without the need to apply to, or receive further approval from, the Court;

15.     Subject only to the provisions of the DIP Credit Agreement, the automatic stay provisions of Section 362 of the Code will be vacated and modified to the extent necessary so as to permit the Lender to exercise, upon the occurrence of an Event of Default and the giving of five business days' written notice to counsel to the Debtor, the United States Trustee, and counsel to any Committee, all rights and remedies provided for in the DIP Credit Documents;

16.     The DIP Credit Documents and the provisions of this Order are binding upon the Lender and the Debtor and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor) and inure to the benefit of the Lender and the Debtor and their respective successors and assigns (except with respect to any trustee hereinafter appointed or elected for the estate of the Debtor); and

17.     Unless all obligations and indebtedness owing to the Lender under the DIP Credit Agreement shall theretofore have been paid in full, the Debtor shall not seek, and it shall constitute an Event of Default if the Debtor seeks, or if there is entered, an order dismissing this bankruptcy case. If an order dismissing this case under Section 1112 of the Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349(b) of the Code) that (x) the priority claims granted pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all obligations in respect thereof shall have been paid and satisfied in full (and that such priority claims shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall

retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims referred to in clause (x) above.

Date: October ____, 2002

_____

Honorable Eugene R. Wedoff
United States Bankruptcy Judge