## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| EMERALD CASINO, INC., | ) | Case No. 02-22977 |
| | ) | Honorable Deborah L. Thorne |
| Debtor. | ) | |
| | ) | **Hearing Date:  September 13, 2016 at** |
| | ) | **10:00 a.m. (CT)** |
| | ) | **Objection Deadline:  August 23, 2016** |

### SUMMARY OF AMENDED FINAL FEE APPLICATION OF
### ROTHSCHILD INC., AS FINANCIAL ADVISOR AND
### INVESTMENT BANKER TO THE DEBTOR, FOR REIMBURSEMENT OF EXPENSES
### FOR THE FINAL FEE PERIOD NOVEMBER 5, 2002 THROUGH JANUARY 31, 2008

| | |
|---|---|
| Name of Applicant: | Rothschild Inc. |
| Authorized to Provide Services to: | Emerald Casino, Inc. |
| Petition Date: | September 10, 2002 |
| Date of Order Authorizing the Debtor to Retain Rothschild Inc.: | November 26, 2002 |
| Period for Which Final Reimbursement is Sought in the Fee Application: | November 5, 2002, through and including January 31, 2008 |
| Amount of Final Expense Reimbursement Sought as Actual, Reasonable, and Necessary for the Fee Period: | $136,712.49 |
| Total Final Expense Reimbursement Requested for the Fee Period: | $136,712.49 |

590360

This is a(n):            _____ Monthly _____ Interim __X__ Final Application

This is the final fee application filed by Rothschild Inc. in the above captioned matter.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| EMERALD CASINO, INC., | ) | Case No. 02-22977 |
| | ) | Honorable Deborah L. Thorne |
| Debtor. | ) | |
| | ) | **Hearing Date:  September 13, 2016 at** |
| | ) | **10:00 a.m. (CT)** |
| | | **Objection Deadline:  August 23, 2016** |
| _____ | ) | |

### AMENDED FINAL FEE APPLICATION OF ROTHSCHILD INC., AS FINANCIAL ADVISOR AND INVESTMENT BANKER FOR THE DEBTOR, FOR ALLOWANCE AND REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES FROM NOVEMBER 5, 2002 THROUGH JANUARY 31, 2008

Rothschild Inc. ("Rothschild"), financial advisor and investment banker for the above-captioned debtor in its prior chapter 11 case (the "Debtor"), submits this amended final fee application (the "Fee Application") pursuant to sections 328, 330(a), 331 and 503(b) of title 11 of the United States Code (as amended, the "Bankruptcy Code"); Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 5082-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Bankruptcy Rules") for the final allowance and approval of reimbursement of actual and necessary expenses in the amount of $136,712.49 that Rothschild incurred in connection with such services rendered during the period from November 5, 2002 through and including January 31, 2008 (the "Final Fee Period"). This Fee Application amends the *Final Fee Application of Rothschild Inc., as Financial Advisor and Investment Banker for the Debtor, for Allowance and Payment of Compensation for Professional Services Rendered and for Reimbursement of Actual and*

*Necessary Expenses from November 5, 2002 Through January 31, 2008* [Docket No. 2200], filed

with the Court on June 27, 2016 (the "Original Fee Application").    In support of this Fee

Application, Rothschild respectfully states as follows:

### Jurisdiction

1.      The United States Bankruptcy Court for the Northern District of Illinois

(the "Court") has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This

is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§

1408 and 1409.

### Background

2.      At the time of its bankruptcy case, the Debtor was the owner of one of the ten

Illinois riverboat gaming owner's licenses authorized by the Illinois Riverboat Gambling Act,

230 ILCS 10/1, et seq., and issued by the Illinois Gaming Board (the "IGB").

3.      In mid-1997, the Debtor ceased its riverboat gaming operation that, until that

time, was located on the Mississippi River near East Dubuque, Illinois.  Thereafter, the Debtor's

primary activities were focused on the relocation of its gaming operation to a new site near

Rosemont, Illinois.

4.      On June 13, 2002 (the "Petition Date"), an involuntary petition under chapter 7 of

the Bankruptcy Code was filed against the Debtor in this Court.  On September 6, 2002, this

Court entered an order for the relief with respect to the petition.  On September 10, 2002, the

Debtor converted this case under chapter 11 of the Bankruptcy Code.  On November 1, 2002, the

United States Trustee for the Northern District of Illinois (the "U.S. Trustee"), pursuant to

Section 1102(a) of the Bankruptcy Code, appointed an official committee of unsecured creditors (the "Creditors' Committee") to represent the interests of all unsecured creditors in the Debtor's chapter 11 case.

5.    On February 13, 2008, the U.S. Trustee filed a motion to convert the Debtor's chapter 11 case to a liquidation under chapter 7 of the Bankruptcy Code.  On March 19, 2008, the Court granted the U.S. Trustee's motion and converted the Debtor's case to a chapter 7 case.

6.    All services rendered by Rothschild pursuant to the Retention Order (as defined below) during the Final Fee Period were performed at the request or direction of the Debtor or Kirkland and Ellis LLP ("K&E"), counsel to the Debtor in connection with its prior chapter 11 case.

### Retention and Compensation of Rothschild

7.    By letter agreement, dated November 5, 2002 (the "Engagement Letter"), the Debtor retained Rothschild to assist the Debtor with a restructuring transaction.  A copy of the Engagement Letter is attached hereto as Exhibit C, and Rothschild respectfully refers this Court to the Engagement Letter for a full recitation of its terms.  In summary, the Debtor retained Rothschild to provide investment banking services, including, without limitation:

> (a) provide financial advisory services in connection with a sale, divestiture, spin-off or other Transaction (as further defined in the Engagement Letter) involving all or substantially all the stock or assets of the Debtor;
>
> (b) provide information to any potential Acquirer (as further defined in the Engagement Letter) or other party interested in purchasing the Debtor;
>
> (c) negotiate the terms of a plan of reorganization or other transaction;
>
> (d) if requested by the Debtor, participate in hearings before the Bankruptcy Court and provide relevant testimony with respect to any sale or other transaction;

(e) otherwise advise the Debtor with regard to the structuring and closing of a sale or other Transaction; and

(f) render such other financial advisory services as may be agreed upon by Rothschild and the Debtor in connection with any of the foregoing.

8.    On November 5, 2002, the Debtor filed an Application for an Order Authorizing the Retention of Rothschild, *nunc pro tunc* to November 5, 2002, under the terms of the Engagement Letter. On November 26, 2002, this Court entered the *Order Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2014(a), 2016 and 5002, Authorizing the Employment and Retention of Rothschild Inc. as Investment Banker for Debtor and Debtor in Possession* [Docket No. 209] (the "Retention Order").

9.    The Retention Order required the Debtor to (among other things) reimburse Rothschild for its reasonable out-of-pocket expenses incurred in connection with the provision of services, the execution, delivery and enforcement of the Engagement Letter, and the consummation of any Transaction, in each case including, without limitation, the fees, disbursements and other charges of Rothschild's counsel. Reasonable expenses, as listed in the Engagement Letter, also include, but are not limited to, expenses incurred in connection with travel and lodging, data processing and communication charges, research and courier services. Consistent with and subject to the existing orders of the Court, the Debtor shall promptly reimburse Rothschild for expenses upon presentation of an invoice or other similar documentation with reasonable detail.

10.    By this Fee Application, Rothschild seeks allowance of reimbursement of reasonable and necessary expenses incurred by Rothschild during the Final Fee Period in the amount of $136,712.49, which amount excludes expense amounts previously disallowed by the

Court.

11.     While Rothschild performed the services set forth above as financial advisor to the Debtor, Rothschild, following discussions with counsel to Frances Gecker, the Trustee in the Debtor's chapter 7 case, filed this Fee Application to amend the Original Fee Application. This Fee Application only seeks reimbursement of Rothschild's reasonable and necessary expenses and Rothschild is not seeking any other compensation in connection with the services rendered to the Debtor during its chapter 11 restructuring.

### Personnel Who Rendered Services

12.     Senior level professionals have directed Rothschild's team with extensive experience in the areas of investment banking, bankruptcy services and mergers and acquisitions. Members of Rothschild's restructuring group and corporate finance group performed the investment banking services set forth above. The restructuring group's services were performed primarily by Todd R. Snyder, Managing Director (now Executive Vice Chairman and Co-Chair of the North American Debt Advisory and Restructuring Group), Ira L. Wolfson, Vice President (now Executive Vice Chairman), Robert C. Fisher, Associate (no longer with Rothschild), Carissa L. Meyer, Analyst (no longer with Rothschild), and other professionals, as needed. Rothschild's general staffing policy is to assign senior bankers, experienced junior bankers and financial analysts to each restructuring assignment. The senior banker, Todd R. Snyder, had overall responsibility for the case. He was primarily responsible for developing strategy with respect to the case, directing negotiations and interfacing with the other senior professionals involved with the case. The additional senior banker, in this case Ira L. Wolfson, and the experienced junior banker, in this case Robert C. Fisher, assisted in the day-to-day coordination

of the case and performed, with the financial analyst, in this case Carissa L. Meyer, extensive financial analyses as well as prepared process materials. The senior bankers, the experienced junior banker and the financial analyst coordinated their actions so as to not duplicate efforts. Given that the senior bankers, the experienced junior banker and the financial analyst had different roles in the Debtor's case but had overlapping responsibilities, there were frequent times where it was appropriate for two or more bankers to be present at a meeting.

### Summary of Services Rendered

13.    Sale Process. Rothschild recommenced the sale process for the Debtor on December 22, 2003 (the "Third Sale Process"), as described in detail in Rothschild's Fourth Interim Fee Application. Pursuant to the bidding procedures approved by the Bankruptcy Court on December 30, 2003, Rothschild performed the following services:

(a)    Held frequent discussions and conference calls with K&E, the Debtor and the IGB staff, including regularly scheduled weekly update calls with the IGB.

(b)    Revised and updated a public notice of sale, published on January 6, 2004 in the New York Times, Wall Street Journal, Chicago Tribune, Chicago Sun Times, Las Vegas Review Journal, Lake County Daily Herald, Champaign News Gazette, State Journal Register of Springfield, IL, Peoria Journal Star, St. Louis Post Dispatch, North American Media, Press of Atlantic City and Daily Southtown Star Newspapers, identifying the asset for sale, court of jurisdiction, and Rothschild representatives to contact regarding potential interest in acquiring the Debtor. In addition, an email including the Notice of Sale was sent by the Debtor to 10,000 professionals in the gaming industry.

(c)    Supplied potential bidders with a letter detailing the bidding procedures and required key terms for binding proposals to be received on January 19, 2004.

(d)    Held multiple discussions with potential buyers regarding the sale process, the Debtor's chapter 11 proceedings, bidding procedures, including next steps following submission of binding proposals, and the terms to be included in binding proposals.

(e)    Received seven binding proposals for the Debtor on January 19, 2004.

(f)     Prepared a comprehensive summary analysis of the seven binding proposals received on January 19, 2004, which included detail on purchase price, consideration, partners, location, timing to commence operations, projected tax revenues to the State of Illinois, financing conditions, conditions to closing, leverage statistics, community revenue sharing plans, charitable contribution plans, ownership structure, Statutory Shareholder considerations and key points of clarification.   Rothschild provided the Debtor, the IGB and the Creditors' Committee such analysis on January 24, 2004.

(g)     On January 20, 2004, pursuant to the bidding procedures, Rothschild held a press conference in the IGB auditorium where it disclosed the identity, partners and locations of the seven parties that submitted binding proposals.

(h)     As set forth in the bidding procedures, Rothschild held multiple conversations with the seven parties that submitted binding proposals and with their respective advisors and, if applicable, their financing providers to refine and clarify proposals between January 19, 2004 and January 28, 2004 ("Refine and Clarification Phase").  Such conversations included discussion on purchase price, consideration, timing to commence operations, projected tax revenues to the State of Illinois, financing conditions, conditions to closing, leverage statistics, community revenue sharing plans, charitable contribution plans, ownership structure, Statutory Shareholder considerations and key points of clarification.

(i)     On January 28, 2004, following the Refine and Clarification Phase and pursuant to the bidding procedures, Rothschild submitted a revised summary analysis of the seven binding proposals to the IGB and the Creditors' Committee.

(j)     At the request of the IGB, Rothschild held due diligence sessions with each of the seven bidders regarding their 5-year projections, which supported the bidders' written proposals on tax revenue to the State of Illinois.  In this regard, Rothschild analyzed each of the proposed projections, including the methodologies employed to develop projection assumptions for attendance, win per slot and win per table; operating expenses; project construction expenses; cash flow and capitalization assumptions.   Rothschild then benchmarked these assumptions and resulting projections to the publicly available data on the existing casinos in the Chicagoland market, including the Grand Victoria Elgin, Harrah's Joliet, City of Lights, Aurora and Empress Joliet.   In addition, Rothschild performed a debt capacity and financeability analysis of each of the proposed projections.  In this regard, Rothschild compared the implied derived leverage ratios and interest coverage statistics for each of the seven biding proposals on both an individual project and total company basis, and then compared the leverage ratios and coverage statistics to the comparable statistics of twelve publicly reported casino companies.

(k)     On March 1, 2004, Rothschild attended the public proposal presentations made by each of the Final Bidders selected by the IGB.

14.     _Auction_. As set forth in the bidding procedures, Rothschild conducted the auction for the gaming license held by the Debtor at the offices of K&E, which began at 9:00 a.m. on March 10, 2004 and concluded early the morning of March 11, 2004. At the start of the auction, binding proposals made by Harrah's Entertainment, Midwest Gaming and Entertainment, and Isle of Capri Casinos, Inc. ("Isle of Capri") consisted of $375 million, $360 million and $351 million, respectively. Following 16 hours of bidding, final bids were cash consideration of $520 million from Harrah's Entertainment, $518 million from Isle of Capri, and $476 million from Midwest Gaming and Entertainment. In addition to improving purchase price, the auction produced guarantees of operating commencement dates by Harrah's Entertainment and Isle of Capri, each agreeing to pay a $500,000-a-day penalty, up to $105 million over 210 days, if their casinos are not operating 8 months after closing and 12 months after closing, respectively. During the auction, Rothschild also improved other contractual terms of the final bidders. At the conclusion of the auction, upon consultation with the IGB and the Debtor, and pursuant to the Court approved bidding procedures, Rothschild submitted a letter to the IGB recommending one proposal be the winning proposal and its reasons therefore. On March 15, 2004, the IGB selected Isle of Capri as the winning bidder of the auction. Following this process, the Attorney General of the State of Illinois commenced an investigation regarding Isle of Capri's bid and its ability to operate the Debtor's casino. Following the auction and investigation, the _Debtor's and Committee's Joint Fifth Amended and Restated Chapter 11 Plan (Modified as of July 20, 2004)_ [Docket No. 1362] (the "Plan") was confirmed on July 22, 2004. Ultimately, the Debtor was unable to consummate the Plan and the Court converted the Debtor's chapter 11 case back to a

case under chapter 7 of the Bankruptcy Code. Thereafter, the IGB revoke the Debtor's gaming license and ultimately awarded that license to a bidder identified by Rothschild in connection with the sale and marketing process undertaken in connection with the Debtor's chapter 11 case.

15.    <u>Creditor Meetings and Discussions</u>.  Rothschild held additional discussions with the Creditors' Committee regarding the timing, process, and key terms of binding proposals for a potential reinitiated sale process, as well as conversations with and submissions from potential buyers.

16.    <u>Discussions with Emerald Casino, Inc. Board of Directors</u>.  Rothschild participated in several meetings with representatives of the Board of Directors of the Debtor. Rothschild discussed and reviewed, among other things, comprehensive lists of potentially interested buyers, sale process timing, marketing materials and key terms of indications of interests to acquire the Debtor, merger agreement and draft plan of reorganization.

17.    <u>Data Room and Online Data Site</u>.  Rothschild collected, reviewed and updated documents and exhibits for the data room and online data site (initially prepared for the sale process begun in December 2002), both of which were made available to potential buyers during the Third Sale Process.

18.    <u>Bankruptcy Court Hearings / Testimony</u>.  Rothschild prepared testimony on behalf of the Debtor with regard to Bankruptcy Court hearings and the transaction, including proceedings to determine legality of gaming license revocation proceedings by the State of Illinois.

<b><u>Necessity of Services Provided by Applicant</u></b>

19.    Rothschild respectfully submits that the services it has rendered to the Debtor

have been necessary and in the best interest of the Debtor and the estate and have furthered the goals of all parties in interest.

20.    The services summarized by this Fee Application and rendered by Rothschild to the Debtor during the Final Fee Period were substantial, highly professional and instrumental to the Debtor. Expenses associated with the rendering of such services were reasonable and necessary to the Debtor's performance of its duties and should be approved by the Court.

### Summary of Expenses Incurred

21.    Rothschild incurred reasonable and necessary out-of-pocket expenses aggregating [FULL AMOUNT]   during the Final Fee Period, of which the Court ultimately allowed $136,712.49 on an interim basis during the Debtor's chapter 11 case. The amount of expenses sought in this Fee Application and Rothschild's billing process were consistent with market practices for investment banking firms both in and out of a bankruptcy context. Rothschild submits that all such expenses were necessarily incurred, are reasonable in amount and represent only the actual costs incurred.

22.    Rothschild's charges for expenses to the Debtor were determined in the same manner as for clients in non-bankruptcy matters and were consistent with guidelines promulgated by the United States Trustee with respect to applications for the payment of fees and expenses of professionals engaged in chapter 11 cases (the "UST Guidelines"), as well as the Local Bankruptcy Rules of this Court, in effect during the Final Fee Period. Out-of-pocket expenses incurred by Rothschild are charged to a client if the expenses are incurred for the client or are otherwise necessary in connection with services rendered for such particular client. Rothschild does not factor general overhead expenses into disbursements charged to clients in connection

with chapter 11 cases.  Rothschild followed its general internal policies in effect during the

chapter 11 case with respect to out-of-pocket expenses billed to the Debtor as set forth below,

with any exceptions fully explained.

(a)    Rothschild bills breakfast or dinner meals to a client if the employee is traveling on client matters at cost.  Meal expenses incurred during meetings which employees and other meeting participants are required to attend are billed at cost.

(b)    Messengers and couriers are used by Rothschild to deliver hard copy documents relating to a client matter, which require receipt on an expedited basis; otherwise, Rothschild uses the regular postal system.  Any charges for either messengers or couriers are billed to a client at cost.

(c)    All airfare charges billed to a client in a chapter 11 case are based on coach fare rates.

(d)    Rothschild charges for transportation to and from airports and while traveling on client matters at cost.

(e)    The research/database category consists of the cost of using databases (*e.g.*, Disclosure, Securities Data Corporation, Dow Jones, Lexis-Nexis, etc.) to which Rothschild subscribes to search for and obtain information used in Rothschild's financial analyses.  Rothschild pays the vendor's standard rate for such database services.  In certain instances, Rothschild has determined that paying a flat annual or monthly fee for such services is less costly than contracting for such services on a per use basis.  Such annual or monthly services are allocated to clients based on such clients' use of each service.  The research category also consists of charges from outside services, which supply, for a fee, financial documents from regulatory agencies which cannot be obtained from databases subscribed to by Rothschild.

(f)    Rothschild bills photocopying charges at the rate of $.10 per page for black and white copies and $1.00 per page for color copies.

(g)    Telephone expenses are charged based on Rothschild's actual cost of telephone charges with respect to client matters.  Cellular phone charges are based on vendor's actual invoices.

(h)    Conference calls arranged through a third party vendor are charged a $0.75 per minute usage charge based on the vendor's charges for such services.

## Rothschild's Requested Reimbursement Should be Allowed

23.     Section 331 of the Bankruptcy Code provides for interim compensation of professionals and incorporates the substantive standards of section 330 of the Bankruptcy Code to govern the Court's award of such compensation.   Section 330 of the Bankruptcy Code provides that, subject to section 328 of the Bankruptcy Code, a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual necessary services rendered . . . and reimbursement for actual, necessary expenses." 11 U.S.C. §330(a)(1).

24.     The Retention Order approved Rothschild's expense reimbursement pursuant to section 328 of the Bankruptcy Code, subject to the terms of the Retention Order.  Accordingly, reimbursement is sought subject to the standard of review set forth in section 328 of the Bankruptcy Code, and not the standard of review set forth in section 330 of the Bankruptcy Code, but subject to the terms of the Retention Order.

25.     The services summarized by this Fee Application and rendered by Rothschild to the Debtor during the Final Fee Period were substantial, highly professional and instrumental to the Debtor in furtherance of its restructuring efforts.   Rothschild respectfully submits that the reimbursement requested by this Fee Application is reasonable in light of the nature and value of such services.

## Notice

26.     Notice of this motion has been provided to: (a) the Office of the U.S. Trustee for the Northern District of Illinois; (b) Frances Gecker, in her capacity as Chapter 7 Trustee; and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## Conclusion

27.     Rothschild respectfully requests that the Court: enter an Order approving (i) the final allowance of actual, necessary and reasonable costs and expenses to Rothschild in the amount of $136,712.49 incurred during the Final Fee Period; and (ii) grant such other and further relief as is requested herein or as is otherwise necessary or appropriate.

Dated: New York, New York
       August 23, 2016

ROTHSCHILD INC.

By: _____

TODD R. SNYDER
Executive Vice Chairman and Co-Chair
of North American Debt Advisory and
Restructuring Group
Rothschild Inc.
1251 Avenue of the Americas
33rd Floor
New York, New York 10020
Telephone: (212) 403-3500

INVESTMENT BANKER FOR THE
DEBTOR