UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| EMERALD CASINO, INC. | ) | Case No. 02 B 22977 |
| | ) | |
| Debtor. | ) | Judge Deborah L. Thorne |

**MEMORANDUM OPINION**

This matter is before the court on the Trustee's objection to Chaz Ebert's claim. Although the face of her claim shows it is for a "stock subscription"[1], Ebert contends that it should be treated in the same manner as claims held by the "Payton Parties", individuals who previously assigned their claims to the Trustee in exchange for special treatment. In 2008, the Payton Parties entered into a court-approved settlement agreement with Francis Gecker, the chapter 7 Trustee. Ebert did not enter into the settlement and, therefore, is not entitled to treatment as a Payton Party. As a part of the 2008 settlement, the Trustee agreed that the Payton Parties would be paid after general unsecured creditors received a distribution of 75% of their allowed claims and thereafter would receive distributions pro rated with the general unsecured creditors. At the time of the settlement, no one knew whether the Payton Parties would receive any payment because it was not clear whether the Trustee would be successful in the litigation. Thus, as a part of the settlement agreement with the Trustee, the Payton Parties would be paid prior to any distribution to equity holders. Although Ebert did not file an objection to the 2008 settlement, she has objected to the payment of the Payton Parties and has repeatedly sought to be treated as one of the Payton Parties.[2]

---

[1] Ms. Ebert amended her claim on March 12, 2015 increasing the alleged interest and attorneys' fees claimed. The amended claim states that it is for a stock subscription.
[2] See Dkt No. 2292.

1

As described more thoroughly below, the Payton Parties agreed to accept the risk of litigation pursued by the Trustee, a risk that Ebert did not accept. Her interest is no longer identical to the Payton Parties and has not been since the assignment and settlement were approved in 2008. Ebert now seeks additional discovery from the Trustee to support her claim that the Trustee orally agreed to treat her as a Payton Party. She also argues that because the Illinois Gaming Board did not approve her as a shareholder, she holds a general unsecured claim against the Debtor's estate which should not be subordinated under section 510(b) of the Bankruptcy Code.

The court has reviewed the docket in this case, the Trustee's objection, related pleadings regarding the objection, the arguments made in court, and the request for additional discovery made by Ebert.[3] After considering all of the arguments and pleadings in this case, the Trustee's objection is sustained. Ebert holds an equity interest and is not entitled to be treated as a Payton Party or as a general unsecured creditor.

### 1. Background

Chaz Ebert is a statutory investor, one of several minority individuals who invested over $30 million in Emerald Casino. The statutory investors were invited to invest at the time Emerald Casino decided to relocate to Rosemont, Illinois. In order to relocate, Emerald attempted to comply with an amendment to the Illinois Gambling Act which required it to have at least 20% minority and female investors. The Illinois Gaming Board (IGB) required that each statutory investor be officially approved prior to becoming a shareholder. Specifically, the subscription agreements stated Emerald "will hold the shares [of Emerald]'s common stock . . . in escrow

---

[3] The Emerald Casino case was filed in 2002 and until October 2015 Judge Eugene Wedoff presided over the case. In October 2015, Judge Deborah Thorne inherited this case and for that reason has studied the docket extensively to understand the orders and other matters which preceded October 2015. The case involves numerous pleadings filed in the District Court for the Northern District of Illinois and the Seventh Circuit Court of Appeals.

2

until the Illinois Gaming Board determines that you are an acceptable owner of [Emerald]. At that time [Emerald] will deliver to you a stock certificate and a fully executed copy of your Shareholders' Agreement". The IGB never approved Ebert and others as shareholders and Emerald never returned any of the statutory investors' funds, instead using the money to commence construction of its new casino in Rosemont.

## A. Emerald Bankruptcy

On June 13, 2002, an involuntary chapter 7 bankruptcy petition was filed against Emerald. On September 10, 2002, the Debtor consented to the entry of an order for relief and converted the case to one under chapter 11. On March 19, 2008, the case was converted back to chapter 7, and on March 20, 2008, the United States Trustee appointed Frances Gecker as trustee.

## B. The Payton Action and Bankruptcy Court Settlement with Payton Parties

In October 2007, certain statutory investors including Ebert, filed an action against the Debtor's officers and directors in the Circuit Court of Cook County[4] seeking relief under various theories on account of their losses arising from their investments in the Debtor. At some point and for a reason unknown to this court, Ebert did not continue as a state court plaintiff. In October 2008, certain state court plaintiffs entered into a settlement with the Trustee and were referred to as the Payton Parties. Among other things, the settlement provided the following:

(a) The Payton Parties agreed to assign the claims set forth in the Payton Action to the estate in exchange for a share of the estate's recovery based upon those and any related claims asserted by the Trustee; and

(b) The Payton Parties agreed that the Payton Party Claims be subordinated to the allowed timely filed claims of general unsecured creditors (the ""GUC Claimants") until the GUC Claimants receive a distribution equal to 75% of the allowed amounts of their claims; at which time the Payton Party Claims would be deemed allowed.

---

[4] Payton v. Flynn, Case No. 2007 L 011989.

3

After notice and a hearing, the settlement was approved by the bankruptcy court in November 2008.[5] Although the parties disputed whether the Payton Party claims were for debt or equity, the settlement allowed the Trustee to pursue the assigned claims against the officers and directors of Emerald while also avoiding any litigation over the nature of the assigned Payton Party claims. As part of the consideration for the settlement, the Payton Parties agreed that they would receive a pro rata distribution from the proceeds of the litigation but only after general unsecured creditors received payment of 75% of their claims. On September 5, 2019, this court approved the treatment of the Payton Party claims. As of today, general unsecured creditors have received payment of at least 75% of their allowed claims and the "Payton Parties" have received substantial recoveries on their claims.

### C. Chaz Ebert's Claim

The claim filed by Ebert states that it is based upon a subscription agreement. In reviewing the documents filed by the Trustee in support of her claim objection, it is apparent that Ebert entered into a subscription agreement,[6] paid for shares,[7] was a party to a shareholders' agreement,[8] and attended shareholders' meetings.[9] The Trustee also asserts that Ebert reported her percentage of Emerald ownership and losses on her tax returns for the past 20 years. Ebert has not refuted this assertion. While there is a dispute between the parties regarding whether

---

[5] Neither party has explained why this occurred and after scouring the docket in this case, this court has been unable to find any explanation as to why Ebert was not a Payton Party. There appears to be no dispute over the fact that she is not a Payton Party. At some point prior to the execution of the Settlement Agreement and bankruptcy court approval, Ebert was dropped as a plaintiff and was not a party to the State Court Action. Ebert was provided with notice of the hearing regarding the approval of the Payton Parties Settlement Agreement and did not object until after the time the Trustee had recovered significant funds many years later.

[6] Dkt. No. 2334 page 9.
[7] *Id*.
[8] Dkt. No. 2340, Exhibit. C, page 1.
[9] *Id*.

4

Ebert voted her shares at the shareholder meeting, it appears at all times that Emerald treated her as a shareholder in every way. Emerald designated her as an owner on its books and records, listed her as a shareholder on both federal and state income tax returns and solicited her vote at shareholder's meetings. Since the reconversion of the case to chapter 7, the Trustee has issued Internal Revenue Service Form K-1s to Ebert reflecting her percentage of ownership and losses in the Debtor. On November 15, 2002, Emerald filed its List of Equity Security Holders, identifying Ebert as an Emerald shareholder. Further, under Emerald's bylaws, the definition of shareholder is a holder of record of units of proprietary interest in the company. Ebert did not object to the treatment as a shareholder despite the failure of the IGB to approve her as a shareholder.

### D. Trustee's Objection

The Trustee now objects to Ebert's two claims (#65 and #124), both filed for a "stock subscription".[10] The Trustee's objection asks that the claims be treated as equity interests and not as general unsecured claims, arguing that they should be subordinated under 11 U.S.C. § 510(b). Ebert claims that subordination under § 510(b) is improper and that her claim should be treated the same as those of the Payton Parties. Ebert additionally argues that the Trustee is judicially estopped from arguing Ebert's claim is equity, and under the doctrine of equitable estoppel, Ebert's claim should be classified as a general unsecured claim. Although Ebert's claims are prima facie evidence of the amount and the type of claim, the Trustee has included an objection based upon section 510(b) because of Ebert's insistence that she be treated the same as a Payton Party. As discussed below, this court believes that even if Ebert had filed an unsecured claim, she is subordinated under section 510(b).

---

[10] It appears that claim number 124 is an amended claim to claim number 65, adding additional attorneys' fees and interest.

## 2. Discussion

### A. Subordination under § 510(b)

Ebert maintains that she never held an equity interest in the Debtor because the Subscription Agreement was contingent on IGB approval and, because the IGB approval was not issued, she never became a shareholder of the Debtor and thus her claim should be classified as an unsecured creditor. The Trustee asserts that the claim should be subordinated to general unsecured creditors and to the Payton Parties. Although the court finds it unnecessary for the Trustee to object to these claims or argue that they must be subordinated under 11 U.S.C. § 510(b), Ebert has repeatedly argued that she should receive the same treatment as the Payton Parties and for this reason the court is considering the Trustee's argument that subordination under section 510(b) is proper.

The Bankruptcy Code authorizes the payment of creditor claims according to a statutory priority under which claims of the same class are ordinarily paid pro rata. Subordination "alters the otherwise applicable priority of a claim," placing a subordinated claim behind other claims of the same class. *In re SeaQuest Diving LP,* 579 F.3d 411, 417 (5th Cir. 2009); *In re marchFirst, Inc,* 431 B.R. 436, 442 (Bankr. N.D. Ill. 2010). Section 510(b) of the Bankruptcy Code subordinates a claim for, among other things, "damages arising from the purchase or sale of a . . . security" of the debtor or an affiliate of the debtor, forcing that claim to be paid after "all claims or interests that are senior to or equal" the subordinated claim. 11 U.S.C. § 510(b).[11]

---

[11] Section 510(b) states that "a claim arising from rescission of a purchase or sale of a security of the debtor[,] . . . for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."

6

What is meant by the words "arising from the purchase or sale of a security" contained in section 510(b) is ambiguous.  Fortunately, however, the legislative history of this section provides greater clarity as to Congress' intention to distinguish between different risks accepted by investors and creditors upon the insolvency of the debtor.  *See* Report of the Committee on Judiciary, Bankruptcy Law Revision, H.R. Rep. No. 95-595, at 196 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5963, 6156-57.  Congress relied heavily on a law review article by John J. Slain and Homer Kripke- entitled *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors,* 48 N.Y.U. L. Rev. 261 (1973). The article apparently persuaded Congress to include section 510(b) in the 1978 Code, recognizing that while both creditors and investors accept a risk of insolvency, the risk is different between the two, as only investors bear the risk of illegality in the issuance of securities. *In re Pre-Press Graphics Co., Inc.,* 307 B.R. 65, 74 (N.D. Ill. 2004); *In re Granite Partners, L.P.* 208 B.R. 332 (Bankr. S.D.N.Y. 1997); *In re Telegroup, Inc.* 281 F.3d 133, 139 (3d Cir. 2002).

Thus, section 510(b) reinforces the concept that shareholders accept a risk that general unsecured creditors do not.  Disappointed shareholders, who may even have been defrauded cannot later, when their investment goes sour, elevate their interest to one of general unsecured creditors who made a loan or sold merchandise to the debtor.  *In re Med Diversified, Inc.* 461 F.3d 251, 258 (2d Cir. 2006).

Ebert argues that her claim should be treated as an unsecured claim since IGB approval was not received regarding her shareholder status in Emerald.  In examining the same issue asserted by certain other Emerald Casino investors, Judge Pallmeyer held that

7

IGB approval was immaterial to the officers and directors' shareholder status. *See In re Emerald Casino, Inc.*, 530 B.R. 44, 190-195 (N.D. Ill. 2014).

> [Certain defendants] make the squirrely claim that, despite consistently exercising the powers of shareholders and representing themselves as shareholders, they are not in fact shareholders. The Officer Defendants do not dispute that they executed and signed the Amended Shareholders' Agreement. They argue instead that because the IGB never approved them as shareholders, they never became parties to the contract they signed … This argument is without merit.

*Id*. at 190. Under Illinois law, anyone who acts as a shareholder and enjoys the benefits of shareholder status is considered a shareholder. *Id.* at 195.[12]

Ebert signed the shareholder's agreement, held herself out as an equity holder, attended shareholder meetings, filed a proof of claim for an "investment" in Emerald, and reported her percentages of ownership and losses to the IRS. Additionally, the Debtor treated her as a shareholder. It designated her as an owner in its books and records, allocated losses to her on its tax returns, solicited and tallied her votes at shareholders' meetings, and listed her on its List of Equity Security Holders. Further, under the company's bylaws, Ebert was considered a shareholder. *See Emerald Casino*, 530 B.R. at 194. These facts mandate that Ebert be treated as a shareholder, not as an unsecured creditor, and thus her interest should be treated as equity.  Even if she was defrauded by the management of Emerald Casino, she would still hold an interest which would be subordinated to general unsecured creditors who did not accept the risk of being a shareholder.  Moreover, the Payton Parties were authorized by prior court orders to a priority over other equity holders because they assigned their claims and the elevated treatment was approved by the court.  Ebert was not an approved Payton Party and thus is not entitled to that treatment retroactively.

---

[12] Ebert was not a party in the District Court case but the arguments of the Payton Parties in that case mirrors the arguments on this issue now made by Ebert and are persuasive.

8

### B. Judicial Estoppel

Judicial estoppel prevents a party from taking a position contradictory to a position which that party adopted previously. It is an equitable, court-created discretionary doctrine that may be invoked by either a party or the court sua sponte. *New Hampshire v Maine,* 532 U.S. 742, 750 (2001); *Grochocinski v. MayerBrown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (citing *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990)); *In re Airadigm Commc'ns, Inc*., 616 F.3d 642, 661 (7th Cir. 2010) (citing *Butler v. Vill. of Round Lake Police Dep't.*, 585 F.3d 1020, 1022 (7th Cir. 2009)); Nicole C. Frazer, *Reassessing the Doctrine of Judicial Estoppel: The Implications of the Judicial Integrity Rationale,* 101 Va. L. Rev. 1501 (2015). The doctrine is not limited to the same case and can apply when the conflicting positions are taken in different courts. *See id*. at 662-63 (applying judicial estoppel based on a party's inconsistent earlier position with the bankruptcy court compared to its current position on appeal to the Seventh Circuit).

To determine whether judicial estoppel applies, courts generally weigh three factors:

(1) Was the party's later position clearly inconsistent with its earlier position?

(2) Did the party succeed in persuading the prior court to accept its position, so that the second court is misled?

(3) Did the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped?

*In re Knight-Celotex, LLC*, 695 F.3d 714, 721–22 (7th Cir. 2012) (internal quotations omitted). Fundamentally, judicial estoppel is "a matter of equitable judgment and discretion." *Id.* at 721. The three factors are not a rigid test that must be applied whenever judicial estoppel is raised but rather are general guideposts to be considered in the context of all [of] the relevant equities in

9

any given case. *Id*. at 722 (explaining that courts need not "march through" the three factors "one by one").

The Seventh Circuit gives more weight to "whether the party succeeded in the initial proceedings when determining whether that party is precluded from making a contradictory argument in a later case." Frazer, at 1507; *see also In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990). Thus, if the party argued a position and lost, it is not precluded from arguing the position adopted by the prior court even though the party argued otherwise. In *Cassidy*, the debtor adopted a position before the tax court that resulted in a finding that his debt to the IRS was not discharged[13]. In a later filed bankruptcy case, the debtor argued that the IRS debt was dischargeable, thus taking a position that was contrary to the prior case. In reviewing the matter, the Seventh Circuit held that as a result of judicial estoppel, the debtor could not argue a contrary position to that he took, although by default, in the earlier litigation. *Id.* at 641.

Ebert argues the Trustee is judicially estopped from asserting that her claim should be treated as equity because the Trustee previously argued in the state court that Statutory Investors were not shareholders.[14] The argument was never ruled upon in the state court as a result of the voluntary dismissal and running of the state law statute of limitations. Thus, Ebert's argument that the Trustee is judicially estopped is unpersuasive because the Trustee did not succeed in

---

[13] In Cassidy, the debtor failed to answer a request to admit and therefore was deemed to have admitted that his debt to the IRS was not dischargeable. 892 F.2d at 640.

[14] In the state court complaint, attached as Exhibit 4, Docket No. 2334, the Trustee does not state that Ebert or other Statutory Investors were not shareholders. In the District Court opinion, Judge Pallmeyer suggests that the Trustee may have taken a position or stated orally that the statutory investors were not shareholders. *In re Emerald*, 530 B.R. at n. 74. Nevertheless, the state court litigation ended without any specific finding and the Trustee was not successful in prevailing on that position. Although no state court pleadings or transcripts were attached to Ms. Ebert's papers, in the district court, Judge Pallmeyer discussed the state court proceedings and found that the officers and directors, also holding stock without IGB approval, were shareholders as IGB approval was not required to maintain shareholder status.

10

convincing the state court that the Statutory Investors were not shareholders. In *In re Emerald Casino, Inc.*, 459 B.R. 298, 302 (Bankr. N.D. Ill. 2011).

Additionally, Ebert argues that the Trustee is judicially estopped from arguing that the Statutory Investors are shareholders because the Trustee entered into a settlement agreement with the Payton Parties that gave them special treatment. This argument fails for three reasons. First, this is not an inconsistent position. The settlement which was approved was merely a private agreement between the parties, not a position taken in litigation. Second, entering into a settlement agreement, which a court merely approves, is not persuading a court on the merits of an argument. There were no conclusions of law entered by the court regarding whether the Statutory Investors were shareholders or not. Third, the Payton Parties were not treated as general unsecured creditors. They only received distributions after the general unsecured creditors received 75% on their claims.

Lastly, Ebert argues that judicial estoppel should prevent the Trustee from classifying Ebert's claim as equity because the Trustee classified identical claims, those of the Payton Parties, as general unsecured claims. Again, this argument is without merit. The treatment of the Payton Party claims was subject to a court approved settlement agreement between the Trustee and the Payton Parties. Ebert was not a party to this settlement agreement and thus is not entitled to identical treatment. Judicial estoppel does not apply in this case.

### C. Equitable Estoppel

Equitable estoppel "is a doctrine which precludes one party from asserting a claim or defense against another party who has detrimentally altered her position in reliance on the former's misrepresentation or failure to disclose a material fact." *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992) (citation omitted). The elements of equitable estoppel are: "(1)

11

misrepresentation [or failure to disclose a material fact] by the party against whom estoppel is asserted; (2) reasonable reliance by the party asserting estoppel; and (3) detriment to the party asserting estoppel." *Id*. Equitable estoppel is appropriate in bankruptcy proceedings. *In re Davis*, 244 B.R. 776, 794 (Bankr. N.D. Ill. 2000).

Ebert argues that equitable estoppel prevents the Trustee from subordinating her claim because the Trustee orally assured Ebert that her claim would either be treated the same as the Payton Parties' claims or that she would actually share in recoveries with the Payton Parties. Ebert has not satisfied the elements of equitable estoppel and thus the Trustee's objection is sustained.

Ebert has not demonstrated that she reasonably relied on the Trustee's alleged statements. In Ebert's affidavit, she states that she contacted the Trustee at least once per year to ask about the progress of the Payton Party litigation.[15] She does not indicate, however, that any of the conversations with the Trustee preceded the assignments of the Payton Party claims to the Trustee or that she did not assign her claims due to reliance on the Trustee's statements. Had the Trustee told Ebert that she need not assign her claim to be treated as a Payton Party, perhaps there would be reasonable reliance. But no evidence was presented that she did. Meanwhile, Ebert continued to receive K-1 statements from the Emerald Casino estate showing that she was still being treated as equity and apparently reported to the IRS that she was equity. Ebert, who was represented by counsel, had no reason to think that the Trustee could in violation of a prior court order and the Bankruptcy Code, change the treatment of Ebert. The Code sets forth, in section 726, a priority scheme for the distribution of the debtor's assets. *See id*. 11 U.S.C. § 726. Any proposed change to the distribution of property provided in section 726 would require the

---

[15] She further states that "[o]n least one occasion, the Trustee informed me that I would share in the recovery that was paid to the plaintiffs under the Settlement."

12

Trustee to obtain court approval to alter the distribution scheme. *See* 11 U.S.C. § 726(a); *see also* 11 U.S.C.§ 510.

Further, Ebert does not explain how these representations created a detriment or what she might have done differently absent the Trustee's alleged statements. If the Trustee had not made these alleged statements to Ebert, her claim would still be classified as equity. Because these statements were allegedly made after Ebert was dropped as a Payton Party and the settlement agreement approved by this court, she could not have changed her strategy by joining the Payton Party settlement. There are no other avenues for Ebert to receive something on her claim. Ebert did not pursue her causes of action against the directors and officers of Emerald and does not provide any explanation of her failure to pursue those causes of action or failure to re-join the Payton Parties for the settlement agreement.

### 3.  Conclusion

Chaz Ebert filed a claim stating she was an investor. Everything this court has reviewed supports that position. Even if she had filed a claim as a general unsecured creditor, section 510(b) would require that this court treat her claim as one of equity. Neither judicial nor equitable estoppel bar the trustee from treating her claim as one of equity. No further discovery is needed to show that anything further would be discovered showing otherwise.

The motion for further discovery is denied and the Trustee's objection is sustained.

Dated: July 24, 2020

ENTER:

_____
Honorable Deborah L. Thorne
UNITED STATES BANKRUPTCY JUDGE